# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PAUL SIDHU, derivatively on behalf of
SERITAGE GROWTH PROPERTIES,

c/o Timothy Brown Esq.
The Brown Law Firm, P.C.
767 Third Avenue,
Suite 2501
New York, NY 10017

    *Plaintiff,*

    v.

SERITAGE GROWTH PROPERTIES,
500 Fifth Avenue,
Suite 1530
New York, NY 10110
    Serve on:
        THE CORPORATION TRUST
        INCORPORATED
        2405 York Road
        Suite 201
        Lutherville Timonium, MD 21093

    *Nominal Defendant,*

and

ANDREA OLSHAN
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

JOHN GARILLI
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

**C.A. No.** 1:25-cv-00152

**DEMAND FOR JURY TRIAL**

JOHN T. MCCLAIN
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

ADAM METZ
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

TAYLA NEVO-HACOHEN
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

SHARON OSBERG
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

MITCHELL SABSHON
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

ALLISON THRUSH
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

and

2

MARK WILSMANN
c/o Seritage Growth Properties
500 Fifth Avenue,
Suite 1530
New York, NY 10110

     *Defendants.*

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Paul Sidhu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Seritage Growth Properties ("Seritage" or the "Company"), files this Verified Shareholder Derivative Complaint against Andrea Olshan ("Olshan"), John Garilli ("Garilli"), John T. McClain ("McClain"), Adam Metz ("Metz"), Tayla Nevo-Hacohen ("Nevo-Hacohen"), Sharon Osberg ("Osberg"), Mitchell Sabshon ("Sabshon"), Allison Thrush ("Thrush"), and Mark Wilsmann ("Wilsmann") (collectively, the "Individual Defendants," and together with Seritage, the "Defendants") for breaches of their fiduciary duties as trustees and/or officers of Seritage, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Individual Defendants Olshan and Garilli. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases

published by and regarding Seritage, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 7, 2022, to May 10, 2024 (the "Relevant Period").

2.      Seritage is a Maryland corporation based in New York that primarily holds properties acquired from Sears Holding Corporation ("Sears Holdings" or "Sears").

3.      The Company commenced operations on June 3, 2015 as a Real Estate Investment Trust ("REIT") to fund, in part, the $2.7 billion acquisition of certain owner properties of Sears Holdings with a mission to "maximize value for [its] shareholders." After becoming a REIT, Seritage primarily engaged in the leasing, ownership, and development of retail and mixed-used properties throughout the U.S.

4.      Near the start of 2022, the Company revoked its REIT status and subsequently sought shareholder approval of a proposed plan of sale of the Company's assets and eventual dissolution (the "Plan of Sale"). Under the Plan of Sale, Seritage would sell all its assets, distribute the net proceeds from the sale of assets to shareholders, and eventually, dissolve.

5.      The Relevant Period began on July 7, 2022, when Seritage filed its preliminary proxy statement with the SEC on Schedule 14A, in connection with the Company's 2022 Annual Shareholders meeting ("2022 Preliminary Proxy Statement"). The purpose of the preliminary proxy statement was to prepare for seeking shareholder approval of the Plan of Sale.

6.     The 2022 Preliminary Proxy Statement stated that, "[i]f our shareholders approve this proposal . . . . the Board will have the authority to approve the disposition of [the Company's assets]." The Company explained that "we expect to distribute the net proceeds of our plan of sale to our shareholders. Based upon management's review and evaluation with its advisors . . . we have estimated . . . that the Estimated Total Shareholder Distributions Range will be between $18.50 and $29.00 per share. Our Estimated Total Shareholder Distributions Range was derived from the estimated total gross asset sale proceeds, less [expenses, debts, and wind-down costs.]"

7.     Then, on August 9, 2022, Seritage released its second quarter 2022 financial results in a Form 10-Q filing with the SEC ("Q2 2022 10-Q"), which affirmed previously reported asset valuation figures of $2,237,313,000, including $1,032,979,000 in real estate investments. The Q2 2022 10-Q further assured investors that "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

8.     The Q2 2022 10-Q addressed the Company's internal "Evaluation of Disclosure Controls and Procedures" over Seritage's financial reporting, reassuring investors that such management evaluations were "effective."

9.     Then, on September 14, 2022, Seritage filed a definitive proxy statement with the SEC on Schedule 14A ("2022 Proxy Statement") in connection with the Plan of Sale. Regarding the Plan of Sale, the 2022 Proxy Statement touted the likely market value of Seritage's holdings, stating that "the Company's estimate of total gross asset sale proceeds ranged from $2,848,035,000 to $3,557,999,000."

10.     The 2022 Proxy Statement also addressed management's valuation process of

Seritage's Estimated Total Shareholder Distribution Range, reassuring investors that the valuation figures were "derived based on data and information reviewed by Company management and advisors . . . and was designed to reflect a range to account for potential fluctuations to the inputs used to derive the range[.]"

11.    On October 24, 2022, Seritage filed a current report on Form 8-K with the SEC announcing that the shareholders had approved the Plan of Sale in connection with the 2022 Proxy Statement.

12.    On August 14, 2023, the truth began to emerge when Seritage revealed that the Company's internal controls over financial reporting contained design flaws which failed to identify red flags that indicated impairment of the Company's real estate investments, including its development projects. Further, the Company failed to properly record and document evidence of its impairment review. Seritage admitted that these internal control design flaws were a "material weakness."

13.    The truth fully emerged on May 10, 2024, in a Company quarterly filing, when Seritage revealed that, as a result of its internal controls' "material weakness," the Company had to adjust its pricing projections for some of its assets. In doing so, the Company reduced its asset portfolio's gross value by at least $325 million.

14.    On this news, the price of the Company's stock fell 27.3%, or $2.54 per share, from a closing price of $9.32 per share on May 10, 2024 to close at $6.78 per share on May 13, 2024, the next trading day, on unusually heavy trading volume.

15.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and

prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Seritage lacked effective internal controls which failed to identify and review impairment indicators for real estate investments held by the Company; (2) as a result, Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; and (3) as a result, Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

16.    In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, and its CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current trustees, of the collective engagement in fraud and misconduct by the Company's trustees, of the substantial likelihood of the trustees' liability in this derivative action, of the CEO's and CFO's liability in the Securities Class Action, and of their not

being disinterested and/or independent trustees, a majority of the Company's Board of Trustees (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Seritage. Plaintiff has continuously held Seritage common stock at all relevant times.

### Nominal Defendant Seritage

24.     Seritage is a Maryland corporation with its principal executive offices at 500 Fifth

Avenue, Suite 1530, New York, NY 10110. Seritage's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SRG."

**Defendant Olshan**

25.     Defendant Olshan is CEO of the Company and has served as a Company trustee since March 2021. According to the Company's Schedule 14A filed with the SEC on April 23, 2024 (the "2024 Proxy Statement"), as of April 17, 2024, Defendant Olshan beneficially owned 160,027 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $9.27, Defendant Olshan owned approximately $1,483,450 worth of Seritage stock as of that date.

26.     For the fiscal year ended December 31, 2023 ("Fiscal Year 2023"), Defendant Olshan received $2,404,615 in total compensation from the Company. This included $1,000,000 in salary, $1,400,000 in bonuses, and $4,615 in all other compensation. For the fiscal year ended December 31, 2022 ("Fiscal Year 2022"), Defendant Olshan received $4,411,262 in total compensation from the Company. This included $1,000,000 in salary, $1,400,000 in bonuses, $1,999,993 in stock awards, and $11,269 in all other compensation.

27.     The 2024 Proxy Statement stated the following about Defendant Olshan:

Ms. Olshan, age 44, joined Seritage from Olshan Properties, a privately held real estate firm specializing in the development, acquisition, and management of commercial real estate, where she has served as Chief Executive Officer since 2012. Prior to serving as Chief Executive Officer, Ms. Olshan served as the Chief Operating Officer of Olshan Properties, and was responsible for the entire operating business, portfolio, and joint ventures, including the company's accounting, construction, capital markets, investments, human resources, and legal departments. Ms. Olshan is the Chairman of the board of directors of Olshan Properties. Ms. Olshan previously served on the board of directors of Morgans Hotel Group from 2013 through 2016, serving on both the Compensation Committee and Audit Committee of its board of directors. Ms. Olshan is actively involved in numerous civic and social service organizations. She is a trustee of the Horace Mann School and a Vice Chair of the board of directors of 92NY. Ms. Olshan's deep real estate industry and market expertise, as well as her significant

experience as the chief executive officer of several large real estate companies, makes her well qualified to serve as a trustee of the Company.

**Defendant Garilli**

28.    Defendant Garilli has served as the Company's Interim CFO since January 2022.

29.    The Company's website states the following about Defendant Garilli:

John Garilli serves as the Interim Chief Financial Officer of Seritage. Mr. Garilli has been a member of Winthrop Capital Advisors LLC and its affiliates since 1995, currently serving as President and COO. Mr. Garilli currently serves as Interim President and CEO of Luby's, Inc., a national restaurant company operating the Luby's Cafeterias and Fuddruckers brands, since February 2021 and will continue to serve in that role in the near-term. Mr. Garilli has served as CEO, President, CFO, Treasurer, and Secretary of New York REIT Liquidating LLC since 2018. Prior to this, he served as the CEO of its predecessor, New York REIT, Inc. ("NYRT"), a NYSE-listed real estate investment trust, from July 2018 to November 2018, and as CFO, Secretary, and Treasurer of NYRT beginning in 2017. Previously, Mr. Garilli served as Chief Accounting Officer of Winthrop Realty Trust, a NYSE-listed real estate investment trust, from 2006 to 2012 and served as Winthrop Realty Trust's CFO from 2012 until 2016.

**Defendant McClain**

30.    Defendant McClain has served as a Company trustee since 2015. He also serves as Chair of the Audit Committee and as Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant McClain beneficially owned 2,600 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $9.27, Defendant McClain owned approximately $24,102 worth of Seritage stock as of that date.

31.    For Fiscal Year 2023, Defendant McClain received $155,000 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant McClain received $176,000 in total compensation from the Company, consisting entirely of salary.

32.    The 2024 Proxy Statement stated the following about Defendant McClain:

John T. McClain, age 63, currently serves as the Chief Financial Officer of Iconix

Brand Group, a brand management company. Previously, Mr. McClain served as the Chief Financial Officer of Lindblad Expeditions Holdings, Inc., an expedition travel company. Mr. McClain also served as the Chief Financial Officer of the Jones Group Inc., a leading global designer, marketer and wholesaler of over 25 brands, from July 2007 until its sale to Sycamore Partners in April 2014. Prior to that, Mr. McClain held a number of roles at Avis Budget Group, Inc., formerly Cendant Corporation. He joined Cendant Corporation in September 1999, serving as the Senior Vice President, Finance & Corporate Controller until 2006. From 2006 to 2007, Mr. McClain served as the Chief Accounting Officer of Avis and Chief Operating Officer of Cendant Finance Holdings. Mr. McClain previously held leadership roles at Sirius Satellite Radio Inc. and ITT Corporation. Mr. McClain also serves on the Board of Directors of Lands' End, Inc., where he is chair of the Audit Committee, and previously served on the Board of Directors of Cherokee Global Brands Inc., where he was the chair of the Audit Committee. Mr. McClain has over 25 years of executive financial experience, serving at high-level capacities for the retail and consumer sectors, which qualifies him to serve as a trustee of the Company.

**Defendant Metz**

33.     Defendant Metz has served as a Company trustee since March 2022. He has served as Chairman of the Board, as a member of the Audit Committee, and as a member of the Compensation Committee.

34.     For Fiscal Year 2023, Defendant Metz received $175,000 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant Metz received $92,000 in total compensation from the Company, consisting entirely of salary.

35.     The 2024 Proxy Statement stated the following about Defendant Metz:

Adam Metz, age 62, currently serves as a non-executive director of Hammerson plc, a United Kingdom-based real estate investment trust, since July 2019, five business development companies advised by MS Capital Partners Adviser Inc., a wholly owned subsidiary of Morgan Stanley, beginning in October 2019 and Morgan Stanley Direct Lending Fund, since 2019. Mr. Metz served as a Managing Director and head of International Real Estate at Carlyle Group from September 2013 to April 2018. Prior to Carlyle Group, Mr. Metz was Senior Advisor to TPG Capital's Real Estate Group. Previously, Mr. Metz served as Chief Executive Officer of General Growth Properties ("GGP"), where he led GGP through its restructuring and emergence from bankruptcy. Before joining GGP, Mr. Metz was co-founding partner of Polaris Capital LLC, which partnered with the Blackstone Group on the ownership of a portfolio of retail real estate assets throughout the

United States. Mr. Metz has also held positions at Rodamco, Urban Shopping Centers, JMB Realty and The First National Bank of Chicago. Mr. Metz's previous experience serving as an independent director on numerous boards including, Forest City, Parkway Properties and Howard Hughes Corporation, well qualifies him to serve as a trustee of the Company.

**Defendant Nevo-Hacohen**

36.     Defendant Nevo-Hacohen has served as a Company trustee since April 2022. She also serves as Chair of the Investment Committee and as a member of the Compensation Committee.

37.     For Fiscal Year 2023, Defendant Nevo-Hacohen received $140,000 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant Nevo-Hacohen received $75,000 in total compensation from the Company, consisting entirely of salary.

38.     The 2024 Proxy Statement stated the following about Defendant Nevo-Hacohen:

Talya Nevo-Hacohen, 64, has served as EVP, Chief Investment Officer and Treasurer of Sabra Health Care REIT, Inc. since 2010. From September 2006 to August 2008 and from February 2009 to November 2010, Ms. Nevo-Hacohen served as an advisor to private real estate developers and operators regarding property acquisitions and dispositions, corporate capitalization, and equity and debt capital raising. Previously, Ms. Nevo-Hacohen was a Managing Director with Cerberus Real Estate Capital Management, LLC. From 2003 to 2006, Ms. Nevo-Hacohen served as Senior Vice President-Capital Markets and Treasurer for Healthpeak Properties, Inc. ("Healthpeak")(formerly HCP, Inc.), a healthcare REIT. Prior to her time with Healthpeak, Ms. Nevo-Hacohen spent 10 years with Goldman, Sachs & Co. ("Goldman Sachs") where she was a Vice President in the investment banking and finance, operations and administration divisions. Prior to her affiliation with Goldman Sachs, she practiced architecture and was associated with several architectural firms in New York. Ms. Nevo-Hacohen is the President of the Board of Trustees of South Coast Repertory, and also serves on the Board of Advisors of Yale University's Jackson School of Global Affairs. Ms. Nevo-Hacohen serves as Chairman of the Board of U.S. Friends of Dror Israel, is a member of the Advisory Board of Znest, and also serves as a member of the Board of Spike's K9 Fund . Ms. Nevo-Hacohen's experience advising REITs and finance well qualifies her to serve as a trustee of the Company.

**Defendant Osberg**

12

39.    Defendant Osberg served as a Company trustee from 2018 until June 2023. She served as a member of the Compensation Committee and as a Member of the Nominating and Corporate Governance Committee.

40.    For Fiscal Year 2023, Defendant Osberg received $43,407 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant Osberg received $146,000 in total compensation from the Company, consisting entirely of salary.

41.    The Company's Schedule 14A filed with the SEC on April 9, 2021 (the "2021 Proxy Statement"), stated the following about Defendant Osberg:

> Sharon Osberg, age 71, worked for 25 years in financial technology development and management. The bulk of her career was spent at Wells Fargo Bank, where she became Executive Vice President in charge of the newly created Online Financial Services Division. Ms. Osberg was responsible for charting Wells Fargo's internet course and growing its online business. After leaving Wells Fargo in 2001, Ms. Osberg was Chief Operating Officer for 724 Solutions, Inc. in Toronto, Canada until her retirement in 2003. Ms. Osberg has held various consulting positions for insurance, banking, and technology companies. She also served on the Board of Directors of The Sequoia Fund beginning in 2003 and held the position of Chairperson from 2013 until her retirement in 2015. She currently serves on the boards of Felidae, a non-profit conservation and research organization, and Orangutan Foundation International, a non-profit conservation organization. Ms. Osberg's experience in finance and as a member of boards, including as Chairperson, qualifies her to serve as a trustee of the Company.

**Defendant Sabshon**

42.    Defendant Sabshon has served as a Company trustee since April 2022. He also serves as Chair of the Nominating and Corporate Governance Committee.

43.    For Fiscal Year 2023, Defendant Sabshon received $140,000 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant Sabshon received $75,000 in total compensation from the Company, consisting entirely of salary.

44.    The 2024 Proxy Statement stated the following about Defendant Sabshon:

> Mr. Sabshon, 72, has served as Chairman of the Board of Directors, Chief Executive Officer and Director of InPoint Commercial Real Estate Income, Inc., a

publicly registered, non-listed commercial mortgage REIT, since 2016, Managing Member of Emperus Strategic Advisors, LLC, a privately held financial services consulting firm, since 2024, and Chief Executive Officer of Inland InPoint Advisor, LLC, a privately-held advisor that manages InPoint Commercial Real Estate Income, Inc., since 2016. He previously served as Chief Executive Officer and Director of MH Ventures Fund II, Inc., a privately held manufactured housing community REIT from 2021 to 2024, Chief Executive Officer and Director of Inland Private Capital Corporation from 2016 to 2024, Chief Executive Officer and Director of Inland Real Estate Income Trust, Inc., a publicly registered, non-listed multi-tenant retail REIT from 2014 to 2024, Chief Executive Officer and President of Inland Real Estate Investment Corporation from 2013 to 2024 and Executive Vice President and Chief Operating Officer of Cole Real Estate Investments from 2010 to 2013. Before that, he spent almost 10 years at Goldman, Sachs & Co. in various leadership roles, including President and CEO of Goldman Sachs Commercial Mortgage Capital. He also served as a Senior Vice President in Lehman Brothers real estate investment banking group. Prior to joining Lehman Brothers, Mr. Sabshon was an attorney in the corporate and real estate structured finance practice groups at Skadden, Arps, Slate, Meagher & Flom LLP in New York. Mr. Sabshon's executive experience in real estate well qualifies him to serve as a trustee of the Company.

**Defendant Thrush**

45.    Defendant Thrush has served as a Company trustee since 2019. She also serves as member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant Thrush beneficially owned 5,450 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $9.27, Defendant Thrush owned approximately $50,522 worth of Seritage stock as of that date.

46.    For Fiscal Year 2023, Defendant Thrush received $125,000 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant Thrush received $155,200 in total compensation from the Company, consisting entirely of salary.

47.    The 2024 Proxy Statement stated the following about Defendant Thrush:

Allison L. Thrush, 60, previously served as a managing director of Fortress Investment Group LLC, where she was responsible for capital formation and investor relations for the firm's private equity business. Her responsibilities included fund structuring, fundraising, and negotiation of the firm's private equity

investment partnerships, investor relations and client services, oversight of various advisory boards, and special projects relating to matters such as restructurings, recapitalizations and IPOs. Prior to joining Fortress in 2001, Ms. Thrush directed a portfolio of opportunistic real estate and private equity investments for the New York State Common Retirement Fund. Prior to that, she worked for the New York State Urban Development Corporation and Coopers & Lybrand, now PricewaterhouseCoopers. Ms. Thrush's experience in business, investment and real estate qualify her to serve as a trustee of the Company.

**Defendant Wilsmann**

48.     Defendant Wilsmann has served as a Company trustee since April 2022. He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Investment Committee.

49.     For Fiscal Year 2023, Defendant Wilsmann received $125,000 in total compensation from the Company, consisting entirely of salary. For Fiscal Year 2022, Defendant Wilsmann received $75,000 in total compensation from the Company, consisting entirely of salary.

50.     The 2024 Proxy Statement stated the following about Defendant Wilsmann:

Mr. Wilsmann, 64, spent 31 years in real estate with MetLife Investment Management ("Met Life"), including roles in asset management, acquisitions, mortgage lending, portfolio management, regional operations, and merger integration. He most recently served at Met Life as Managing Director and Head of Equity Investments. He assumed this role in 2012 to help build MetLife's $32 billion direct property investment platform, investing on behalf of the MetLife General Account as well as institutional investors including public and private pension funds, sovereign wealth funds, and insurance companies, via co-mingled funds and managed accounts. He also oversaw more than $7 billion in ground up-development investments in apartments, industrial, office, retail, life sciences, data centers, and hotels. Between 2003 and 2012, Mr. Wilsmann led MetLife's commercial mortgage lending business, directing product design, pricing, and origination activities and chairing the investment committee. Mr. Wilsmann's experience in asset management and mortgage lending well qualify him to serve as a trustee of the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.     By reason of their positions as officers, trustees, and/or fiduciaries of Seritage and because of their ability to control the business and corporate affairs of Seritage, the Individual

Defendants owed Seritage and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Seritage in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Seritage and its shareholders so as to benefit all shareholders equally.

52. Each trustee and officer of the Company owes to Seritage and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53. The Individual Defendants, because of their positions of control and authority as trustees and/or officers of Seritage, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54. To discharge their duties, the officers and trustees of Seritage were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55. Each Individual Defendant, by virtue of their position as a trustee and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as trustees and officers of Seritage, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and trustees of the Company has been ratified

16

by the remaining Individual Defendants who collectively comprised a majority of Seritage's Board at all relevant times.

56.    As senior executive officers and/or trustees of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57.    To discharge their duties, the officers and trustees of Seritage were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and trustees of Seritage were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland, New York, and the United States, and pursuant to Seritage's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Seritage conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Seritage and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Seritage's operations would comply with all applicable laws and Seritage's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.    Each of the Individual Defendants further owed to Seritage and the shareholders the duty of loyalty requiring that each favor Seritage's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

59.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Seritage and were at all times acting within the course and scope of such agency.

60.    Because of their advisory, executive, managerial, directorial, and controlling positions with Seritage, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

61.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Seritage.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a trustee of Seritage was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Seritage and was at all times acting within the course and scope of such agency.

**SERITAGE'S CODE OF CONDUCT**

67.     Seritage's Code of Conduct opens by stating that the Company "values honesty, integrity and adherence to the highest ethical standards." The Code of Conduct provides Company employees with a guide for "upholding these values and maintaining a commitment to basic principles of business ethics and good judgment," and expects employees to uphold "the highest ethical standards." Further, the Code of Conduct emphasizes that the policies "appl[y] to all

officers and employees (collectively, "employees") and the trustees, of the Company and its subsidiaries and controlled affiliates."

68.    Regarding "Accurate Books and Records," the Code of Conduct states the following:

> The Company has adopted a system of internal disclosure controls and procedures to assure that all important information regarding the business and prospects of the Company is brought to the attention of our Chief Executive Officer and Chief Financial Officer. ***The Company's internal controls are essential to the integrity of the Company's financial records and financial statements. The accuracy and timeliness of compliance are necessary to enable our executive officers to provide the financial statements and periodic report certifications required by federal law.*** Employees should promptly report (anonymously, confidentially or otherwise) any actual or suspected breaches or violations of the Company's internal controls or any concerns or complaints regarding questionable accounting or auditing in accordance with the Company's Whistleblower Policy or anonymously through the Governance Hotline at 844-525-1314. Potential fraudulent transactions include, without limitation, embezzlement, forgery or alteration of checks and other documents, theft, misappropriation or conversion to personal use of Company assets, and falsification of records. Employees must be candid in discussing matters concerning internal controls and business disclosures with the Company's trustees, management, internal and outside auditors, and inside and outside counsel.[1]

69.    Regarding "Confidential and Proprietary Information," the Code of Conduct states the following, in relevant part:

> Information is a valuable company asset. You have a duty to safeguard the Company's confidential and proprietary information and information that others have entrusted to us. Generally speaking, confidential and proprietary information is information that has not been disclosed to the general public or that gives our business an advantage or could expose us to harm or liability if released prematurely or inappropriately.

70.    The Code of Conduct section on "Waivers of the Code of Business Conduct and Ethics" states the following:

> Any request for a waiver of any standard in this Code may be granted only by an employee's immediate supervisor and only after advance notice to, and consultation with, the General Counsel, or, in those instances required by this Code, the Chief Executive Officer. Waivers involving any of the Company's executive

---

[1] All emphasis is added, unless otherwise noted, throughout.

officers or trustees may be made only by the Audit Committee of the Board of Trustees and must be disclosed to the Company's shareholders.

71.     Regarding "Audits; Investigations; Disciplinary Action," the Code of Conduct states:

> Appropriate disciplinary actions for violations of this Code may include counseling, reprimands, warnings, suspensions with or without pay, demotions, salary reductions, dismissals and restitution. Any person who takes any action in retaliation against an employee who has in good faith raised any question or concern about compliance with this Code will be subject to disciplinary action, which may include dismissal for cause. The Company's document-retention policies prohibit the destruction or alteration of documentation undertaken in contemplation of, or with the intent to obstruct any pending or threatened, investigation or proceeding.

72.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## SERITAGE'S CHARTER OF THE AUDIT COMMITTEE OF THE BOARD OF TRUSTEES

73.     The Company also maintains a Charter of the Audit Committee of the Board of Trustees (the "Charter"). According to the Charter, the purpose of the Audit Committee is to assist the Board in overseeing:

> (1) the accounting and financial reporting processes of the Company, the audits of the Company's financial statements and the integrity of the Company's financial

statements, (2) the independent auditor's qualifications and independence, (3) the effectiveness of the Company's internal control structure, (4) the compliance by the Company with legal and regulatory requirements and (5) management of risks from cybersecurity threats to the Company.

74.    In a section titled "Guiding Principles and Limitation of Committee's Role" the

Charter states:

> The Audit Committee is dedicated to fostering a proper control structure in the Company, from the environment in which the controls operate to the activities that are performed on a daily basis. The Audit Committee will support management, assist Board oversight of the design and implementation of the Company's internal audit function and the Company's Chief Financial Officer to assess and monitor controls over critical business processes to promote effective and efficient operations, reliable financial reporting, compliance with laws and regulations and the= safeguarding of the Company's assets (including its information technology assets). An open line of communication shall be maintained between the Audit Committee and each of financial management, the independent registered public accounting firm ("independent auditor"), the General Counsel and the Chief Financial Officer.
>
> ***
>
> With regard to financial reporting, the guiding principles to be considered by the Audit Committee in carrying out its responsibilities in reviewing a particular matter shall include consideration of (1) whether the financial statements fairly present the results of operations of the Company in accordance with generally accepted accounting principles, (2) whether the treatment of the matter is consistent with the Company's practices in prior accounting periods, (3) whether the presentation of the matter is reasonably comprehensive under the circumstances, and ***(4) whether the disclosure regarding the matter contains any material misstatement or fails to disclose a matter which reasonably would be considered material to the Company's stakeholders***. While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and in accordance with generally accepted accounting principles and applicable rules and regulations. These are the responsibilities of management and the independent auditor.

75.    In a section titled "Committee Authority and Responsibilities," the Charter states:

> The Audit Committee shall have the sole authority to appoint, determine funding for, retain, terminate and oversee the independent auditor (subject, if applicable, to shareholder ratification). The Audit Committee shall be directly responsible for the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or

issuing an audit report or related work. The independent auditor shall report directly to the Audit Committee.

***

The Audit Committee shall make regular reports to the Board. The Audit Committee shall conduct an annual performance self-evaluation and shall report to the Board the results of the selfevaluation. The Audit Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

76.    In a section titled "Financial Statement and Disclosure Matters," the Charter states

that the Audit Committee shall:

1. Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations (the "MD&A"), and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

2. Review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in the MD&A, prior to the filing of its Quarterly Report on Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements

3. Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

***

7. ***Assume responsibility for oversight of (a) risks and exposures associated with financial matters, particularly financial reporting***, tax, accounting, disclosure, ***internal control over financial reporting***, and credit and liquidity matters, ***and (b) the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies and strategies and programs and policies*** relating to legal compliance.

***

10. Review and discuss with management and the independent auditor the Company's disclosure controls and procedures.

11. Review significant new, or changes to existing, accounting, financial, external reporting and asset-safeguarding policies and practices.

77.    In a section titled "Effectiveness of Internal Controls," the Charter states that the

Audit Committee shall:

21. Review and discuss with management and the independent auditor management's plan for establishing and maintaining internal controls, the framework used to evaluate the Company's control structure and management's subsequent assessment of the effectiveness of the internal controls.

22. Review and discuss with management and the independent auditor disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Annual Report on Form 10-K and Quarterly Reports on Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

23. Review and discuss with management and the independent auditor any major issues as to the adequacy of the Company's internal controls, any special steps adopted in light of material or significant control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

24. Review and discuss with management and the independent auditor the Company's internal controls report and the independent auditor's attestation of the report prior to the filing of the Company's Annual Report on Form 10-K.

78.    In violation of the Charter, Defendants McClain, Metz, and Thrush failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

79.    Seritage is a Maryland corporation based in New York that primarily holds properties acquired from Sears Holdings. Seritage is primarily engaged in the leasing, ownership, and development of retail and mixed-used properties throughout the U.S.

80.    The Company commenced operations on July 7, 2015 as a REIT to fund, in part,

the $2.7 billion acquisition of certain owner properties of Sears.

81.    On October 15, 2018, Sears filed for relief under chapter 11 of title 11 of the United States Code ("Chapter 11") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").   Subsequently, Seritage, along with others, executed a Bankruptcy Court approved master lease (the "Holdco Master Lease") governing 51 properties.

82.    Then, on March 31, 2022, Seritage revoked its REIT election and became a taxable C Corporation with an effective date of January 1, 2022.  Seritage's assets are held by, and its operations are primarily conducted, through Seritage Growth Properties, L.P., a Delaware limited partnership (the "Operating Partnership"). As the sole general partner, Seritage has exclusive responsibility and discretion in the management and control of the Operating Partnership.

83.    Seritage was principally engaged in the ownership, management, development, redevelopment, sale and leasing of diversified mixed-use and retail properties throughout the US. The Company has stated they will continue to actively manage each property until sold.

84.    As of December 31, 2023, the Company's portfolio consisted of interests in 32 properties comprised of approximately 4.1 million square feet of gross leasable area ("GLA") or build-to-suit leased area and 460 acres of land.

85.    Seritage's portfolio currently consists of 23 wholly owned properties (the "Consolidated Properties") comprising approximately 2.8 million square feet of GLA on 326 acres, as well as 9 unconsolidated entities ("Unconsolidated Properties") comprising 1.2 million square feet of GLA on 134 acres.

86.    The Company stated that its mission is to "maximize value for [its] shareholders," and to that end, sought shareholder approval of its Plan of Sale, under which, Seritage would sell

all of its assets, distribute the net proceeds to shareholders, and eventually, dissolve.

### False and Misleading Statements

*July 7, 2022 Preliminary Proxy Statement*

87.    On July 7, 2022, the Relevant Period began when Seritage filed the 2022 Preliminary Proxy Statement. The purpose of the preliminary proxy statement was to prepare for shareholders to approve of the Plan of Sale and stated, in relevant part:

**PROPOSAL 4: PLAN OF SALE AND DISSOLUTION**

At the Annual Meeting, our shareholders will be asked to consider and vote upon a proposal for approval of the plan of sale. If our shareholders approve this proposal, we will be authorized to begin implementing the plan of sale as soon as practicable. Pursuant to the plan of sale, the Board will have the authority to approve the disposition of any or all of our assets in one or more transactions.

\*\*\*

After selling all of our assets and paying off all of our known liabilities and expenses, and making reasonable provisions for any unknown or contingent liabilities, we expect to distribute the net proceeds of our plan of sale to our shareholders. Based upon management's review and evaluation with its advisors, including CBRE, and with input from the Special Committee's financial advisor, Barclays, if the plan of sale is approved by our shareholders and we are able to successfully implement the plan of sale, *we have estimated, based on data and information reviewed by management of the Company as of or prior to early June 2022 (without taking into account macroeconomic, market or other factors after June 7, 2022), that the Estimated Total Shareholder Distributions Range will be between $18.50 and $29.00 per share. Our Estimated Total Shareholder Distributions Range was derived from the estimated total gross asset sale proceeds,* less [expenses, debts, and wind-down costs.]

*August 9, 2022 Press Release*

88.    On August 9, 2022, the Company issued a press release purporting to announce its financial results for the first and second quarter of Fiscal Year 2022 ("August 9th Press Release"). In the August 9th Press Release, Seritage stated they held $2,237,313,000 in total assets, including $1,032,979,000 in real estate investment value.

*August 9, 2022 Q2 2022 10-Q*

89.    The same day, Seritage released its Q2 2022 10-Q. The Q2 2022 10-Q was signed

and certified by Defendants Olshan and Garilli, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the financial statements contained in the Q2 2022 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its trustees.

90.    The Q2 2022 10-Q affirmed the financial statements revealed in the August 9th Press Release and explained that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

91.    The Q2 2022 10-Q addressed internal controls over the Company's financial reporting, stating, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of such date***.

***2022 Proxy Statement***

92.    On September 14, 2022, Seritage filed the 2022 Proxy Statement in connection with the 2022 Preliminary Proxy Statement and the Plan of Sale for the upcoming annual meeting scheduled for October 24, 2022.  The 2022 Proxy Statement was solicited by Defendants Olshan, McClain, Metz, Nevo-Hacohen, Osberg, Sabshon, Thrush, and Wilsmann. The 2022 Proxy Statement solicited shareholders to, *inter alia*: (1) approve the Plan of Sale; and (2) re-elect Defendants Metz and Sabshon to the Board.

93.    Regarding the Plan of Sale, the 2022 Proxy Statement described key portions of the agreement, stating that "the Company's estimate of total gross asset sale proceeds ranged from $2,848,035,000 to $3,557,999,000." The 2022 Proxy Statement also touted management's valuation process of Seritage's Estimated Total Shareholder Distribution Range, by explaining, in relevant part:

> [T]he Estimated Total Shareholder Distributions Range of between $18.50 and $29.00 was derived based on data and information reviewed by Company management and advisors as of or prior to early June 2022, and was ***designed to reflect a range to account for potential fluctuations to the inputs used to derive the range*** and, as a result, variability to the amount that will ultimately be distributed to our Class A shareholders.

94.    Following the annual meeting, on October 24, 2022, Seritage filed a Form 8-K with the SEC announcing that the shareholders had approved the Plan of Sale.

***November 9, 2022 Press Release***

95.    On November 9, 2022, Seritage published a press release announcing its financial results for the third quarter of 2022 ending on September 30th of Fiscal Year 2022 ("November 9th Press Release"). The November 9th Press Release stated that Seritage had total assets valuing $2,054,526,000 including $960,756,000 in real estate investments.

***November 9, 2022 Q3 2022 10-Q***

96.    The same day, Seritage released its third quarter 2022 financial results in a Form 10-Q filing with the SEC ("Q3 2022 10-Q"). The Q3 2022 10-Q was signed and certified by Defendants Olshan and Garilli, pursuant to SOX, attesting to the accuracy of the financial statements contained in the Q3 2022 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its trustees.

97.    The Q3 2022 10-Q affirmed the financial statements revealed in the November 9th

Press Release and explained that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

98.    The Q3 2022 10-Q addressed internal controls over the Company's financial reporting, stating, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of such date.***

***March 14, 2023 Press Release***

99.    On March 14, 2023, Seritage published a press release ("March 14th Press Release") purporting to announce financial results and data for Fiscal Year 2022. The March 14th Press Release stated that Seritage had total assets valuing $1,841,721,000 including $579,099,000 in real estate investments.

***2022 10-K***

100.    That same day, Seritage filed its annual report on Form 10-K for Fiscal Year 2022 with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Olshan, Garilli, Metz, McClain, Osberg, Sabshon, Nevo-Hacohen, Thrush, and Wilsmann. Additionally, it contained SOX certifications signed by Defendants Olshan and Garilli attesting to its accuracy.

101.    The 2022 10-K affirmed the financial results provided in the March 14th Press Release. Further, the 2022 10-K described the asset valuation process by stating that "[r]eal estate

assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

102.    The 2022 10-K addressed internal controls over the Company's financial reporting, stating, in relevant part:

### Evaluation of Disclosure Controls and Procedures

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) under the Exchange Act) that are designed to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

\*\*\*

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures. ***Based on that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective.***

### *April 4, 2023 Press Release*

103.    On April 4, 2023, Seritage published a press release ("April 4th Press Release") purporting to provide a business update on the Company's first quarter of 2023 disposition activity. The Company declared its sales projections by showing the following chart:

| Category | As of 1/1/2023 Total Properties | Sold | Under Contract - No DD | Under Contract - in DD | PSA Neg. | Remaining 2023 Transactions | 2024 & Beyond Remaining |
|---|---|---|---|---|---|---|---|
| Gateway markets | 11 | - | 2 | - | - | - | 9 |
| Primary markets | 43 | 10 | 9 | 1 | 4 | 9 | 10 |
| Secondary markets | 35 | 12 | 6 | 2 | 3 | 5 | 7 |
| Tertiary markets | 16 | 5 | 2 | 2 | 3 | 4 | - |
| **Market Composition Total** | 105 | 27 | 19 | 5 | 10 | 18 | 26 |
| Multi-Tenant Retail | 32 | 18 | 6 | 1 | 1 | 1 | 5 |
| Premier | 10 | - | 2 | - | - | - | 8 |
| Residential | 5 | 2 | 1 | - | - | - | 2 |
| Other Unconsolidated Entities | 13 | - | 3 | - | 1 | 2 | 7 |
| Non-Core Properties | 45 | 7 | 7 | 4 | 8 | 15 | 4 |
| **Property Type Total** | 105 | 27 | 19 | 5 | 10 | 18 | 26 |
| Under $10M | 59 | 16 | 5 | 4 | 9 | 16 | 9 |
| $10M - $30M | 27 | 10 | 9 | 1 | 1 | 1 | 5 |
| $30M - $50M | 11 | 1 | 3 | - | - | 1 | 6 |
| Over $50M | 8 | - | 2 | - | - | - | 6 |
| **Transaction Size Total** | 105 | 27 | 19 | 5 | 10 | 18 | 26 |

### *2023 Proxy Statement*

104.    On April 27, 2023, Seritage filed the 2023 Proxy Statement with the SEC on Schedule 14A for the upcoming annual meeting ("2023 Proxy Statement"). The 2023 Proxy Statement was solicited by Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann. The 2023 Proxy Statement solicited shareholders to approve, *inter alia*: (1) the election of Defendants McClain, Metz, Nevo-Hacohen, Olshan, Sabshon, Thrush, and Wilsmann as trustees; (2) ratification of the appointment of Deloitte & Touche LLP as Seritage's independent registered public accounting firm for Fiscal Year 2023; (3) an advisory, non-binding resolution to approve the Company's executive compensation program; and (4) determine, on an advisory non-binding basis, of the frequency of any future advisory vote on executive compensation.

105.    The 2023 Proxy Statement was materially false and/or misleading when made because the 2023 Proxy Statement failed to disclose that the Company lacked effective internal controls, and omitted materially adverse facts about the Company's business, operations, and prospects. Specifically, the 2023 Proxy Statement failed to disclose to investors, *inter alia*, that: (1) Seritage lacked effective internal controls which failed to identify and review impairment

indicators for real estate investments held by the Company; (2) as a result, Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; (3) as a result, the Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### May 10, 2023 Press Release

106.    On May 10, 2023, Seritage published a press release ("May 10th Press Release") announcing its financial results for the first quarter of Fiscal Year 2023. The May 10th Press Release stated that Seritage had total assets valuing $1,516,373,000, including $564,046,000 in real estate investments.

### May 10, 2023 Q1 2023 10-Q

107.    The same day, Seritage released its first quarter of Fiscal Year 2023 financial results in a Form 10-Q filing with the SEC ("Q1 2023 10-Q"). The Q1 2023 10-Q was signed and certified by Defendants Olshan and Garilli, pursuant to SOX, attesting to the accuracy of the financial statements contained in the Q1 2023 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its trustees.

108.    The Q1 2023 10-Q affirmed the financial statements included in the November 9th Press Release and explained that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

109.    The Q1 2023 10-Q addressed internal controls over the Company's financial reporting, stating, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of such date.***

***August 14, 2023 Press Release***

110.    On August 14, 2023, Seritage published a press release ("August 14th Press Release") announcing its financial results for the first and second quarter of Fiscal Year 2023. The August 14th Press Release stated that Seritage had total assets for the first quarter of 2023 valued at $1,167,967,000, including $447,874,000 in real estate investments.

111.    The statements contained in ¶¶ 87-93, 95-110, and 106-110 above were materially false and/or misleading when made because they failed to disclose that the Company lacked effective internal controls, and omitted materially adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to investors, *inter alia*, that: (1) Seritage lacked effective internal controls which failed to identify and review impairment indicators for real estate investments held by the Company; (2) as a result, Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; (3) as a result, the Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE WHILE FALSE AND MISLEADING STATEMENTS CONTINUE

### *August 14, 2023 Q1 2023 10-Q*

112.    On August 14, 2023, after the market closed, the truth began to emerge in a Company filed Form 10-Q with the SEC for the second quarter of 2023 ("Q2 2023 10-Q"). The Q2 2023 10-Q was signed and certified by Defendants Olshan and Garilli, pursuant to SOX, attesting to the accuracy of the financial statements contained in the Q2 2023 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its trustees.

113.    In the Q2 2023 10-Q, Seritage revealed that the Trust's financial reporting internal controls contained a "material weakness" "due to a deficiency in the design of [Seritage's] control over the identification of impairment indicators for investments in real estate and documentation of evidence of review." The Q2 2023 10-Q described the "material weakness," stating, in relevant part:

> **Evaluation of Disclosure Controls and Procedures.**
> Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that, *as of the end of the reporting period covered by this report, our disclosure controls and procedures were not effective due to the material weakness described below.*
> ***
> **Material Weakness**
> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. In the course of preparing our financial statements for the interim period ended June 30, 2023, management identified a material weakness in our internal control over financial reporting that existed due to a *deficiency in the design of our control over the identification of impairment indicators for investments in real estate and documentation of evidence of review. The deficiency relates to the failure to identify potential indicators of impairment*

***related to development projects in a timely manner.*** This deficiency contributed to the potential for there to be material errors in our financial statements.

114.    On this news, the price of the Company's stock fell 9.7%, or $0.86, per share, from a closing price of $8.89 per share on August 14, 2023 to close at $8.03 per share on August 15, 2023, on unusually heavy trading volume.

### November 8, 2023 Press Release

115.    On November 8, 2023, Seritage published a press release entitled, "Seritage Growth Properties Reports Third Quarterly 2023 Operating Results," ("November 8th Press Release") announcing its financial results for the third quarter of 2023. The November 8th Press Release stated that Seritage had total assets valuing $1,016,290,000 including $398,028,000 in real estate investments.

116.    The November 8th Press Release reported on Seritage's Future Sales Projections "anticipated to occur in 2024 and beyond" for all of the Company's assets. The press release stated, in relevant part:

> The data below provides additional information regarding current ***estimated gross sales proceeds per asset in the portfolio*** as of November 7, 2023.
>
> ***
>
> **Gateway Markets**
> - One Multi-Tenant Asset $25 - $30 million
> - ***Nine Premier Assets*** (Dallas & UTC are each assumed to be sold in two transactions)
>   - ***One Asset $15-$20 million***
>   - ***One Asset $35-$40 million***
>   - ***One Asset $40-$45 million***
>   - ***One Asset $45-$50 million***
>   - ***One Asset $50-$60 million***
>   - ***One Asset $70 - $80 million***
>   - ***One Asset $100 - $150 million***
>   - ***Two Assets $200 - $300 million***

### November 8, 2023 Q3 2023 10-Q

117.    The same day, Seritage released its third quarter 2023 financial results in a Form

10-Q filing with the SEC ("Q3 2023 10-Q"). The Q3 2023 10-Q was signed and certified by Defendants Olshan and Garilli, pursuant to SOX, attesting to the accuracy of the financial statements contained in the Q3 2023 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its trustees.

118.    The Q3 2023 10-Q affirmed the financial statements revealed in the November 8th Press Release and explained that the Company's "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

119.    The Q3 2023 10-Q addressed internal controls over the Company's financial reporting, stating, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the principal executive officer and the principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report.

\*\*\*

Notwithstanding the material weaknesses in our internal control over financial reporting, *our principal executive officer and principal financial officer have concluded that the unaudited condensed consolidated financial statements included in this Form 10-Q fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America.*

*April 1, 2024 Press Release*

120.    On April 1, 2024, Seritage published a press release entitled, "Seritage Growth Properties Reports Fourth Quarter and Full Year 2023 Operating Results," ("April 1st Press

Release"). The April 1st Press Release stated that Seritage had total assets valuing $973,864,000 including $411,037,000 in real estate investments.

121.    The April 1st Press Release reported on Seritage's Future Sales Projections and estimated gross sales proceeds per asset, stating, in relevant part:

**Gateway Markets**
- One Multi-Tenant Asset $25 - $30 million
- ***Nine Premier Assets*** (Dallas & UTC are each assumed to be sold in two transactions)
    - ***One Asset $15-$20 million***
    - ***One Asset $30-$35 million***
    - ***Two Assets $40-$45 million each***
    - ***One Asset $50-$60 million***
    - ***One Asset $70-$80 million***
    - ***One Asset $100 - $150 million***
    - ***Two Assets $200 - $300 million each***

***2023 10-K***

122.    That same day, Seritage filed its annual report on Form 10-K for Fiscal Year 2023 with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Olshan, Garilli, Metz, McClain, Sabshon, Nevo-Hacohen, Thrush, and Wilsmann. Additionally, the 2023 10-K contained SOX certifications signed by Defendants Olshan and Garilli attesting to its accuracy.

123.    The 2023 10-K affirmed the financial results provided in the April 1st Press Release. Further, the 2023 10-K described the asset valuation process by stating that "[r]eal estate assets are recorded at cost, less accumulated depreciation and amortization" and that "[t]he Company, on a periodic basis, assesses whether there are indicators, including macroeconomic conditions, that the value of the real estate assets may be impaired."

124.    The 2023 10-K addressed internal controls over the Company's financial reporting, stating, in relevant part:

**Evaluation of Disclosure Controls and Procedures**
We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and

15d – 15(e) under the Securities Exchange Act of 1934, as amended, (the "Exchange Act")).

***

Notwithstanding the material weaknesses in our internal control over financial reporting, *our principal executive officer and principal financial officer have concluded that the audited consolidated financial statements included in this Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America*.

125.    The statements contained in ¶¶ 115-124 above were materially false and/or misleading when made because they failed to disclose that the Company lacked effective internal controls, and omitted materially adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to investors, *inter alia*, that: (1) Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; and (2) as a result, Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

126.    On April 23, 2024, Seritage filed the 2024 Proxy Statement, solicited by Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann. The 2024 Proxy Statement solicited shareholders to approve, *inter alia*: (1) the election of Defendants McClain, Metz, Nevo-Hacohen, Olshan, Sabshon, Thrush, and Wilsmann as trustees; (2) ratification of the appointment of Deloitte & Touche LLP as Seritage's independent registered public accounting firm for fiscal year 2024; and (3) an advisory, non-binding resolution to approve the Company's executive compensation program.

127.    The 2024 Proxy Statement was materially false and/or misleading when made

because the 2024 Proxy Statement failed to disclose that the Company lacked effective internal controls, and omitted materially adverse facts about the Company's business, operations, and prospects. Specifically, the 2024 Proxy Statements failed to disclose to investors, *inter alia*, that: (1) Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; and (2) as a result, the Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH FULLY EMERGES

### *May 10, 2024 Press Release*

128.    The truth fully emerged on May 10, 2024, after the market closed, in a Company press release ("May 10th 2024 Press Release"). The May 10th 2024 Press Release revealed that, as a result of its internal control's "material weakness," the Company had to "adjust[t its] pricing projections for some of [its] assets." In doing so, the Company reduced its asset portfolio's gross value by at least $325 million.

129.    The May 10th 2024 Press Release specifically revealed the following, in relevant part:

> ". . . Based on **our broad transaction experience**, we are seeing a few themes emerge. Assets previously underwritten for life sciences or tech office are now frequently being reconsidered for other uses in higher demand but with less aggressive rent profiles, which, taken together with high construction costs, drives down the amount that can be paid for land. We are also seeing investors focusing on less risky debt or cash flowing equity investments to generate double-digit returns. Yet, some with a longer-term view are starting to come back to the development market. With more stability in interest rates and inflation, buyers are able to underwrite deals more confidently, albeit at lower valuations. ***As such we are adjusting our pricing projections for some of our assets***." said Andrea L. Olshan, Chief Executive Officer and President.

***

**Future Sales Projections**

The data below provides additional information regarding current estimated gross sales proceeds per asset in the portfolio as of May 7, 2024, excluding assets under contract or in PSA negotiation, which are described above. The assets listed below are either being marketed or are to be marketed and, as a result, any sales thereof are anticipated to occur in 2024 and beyond. Sales projections are based on the Company's latest forecasts and assumptions, but the Company cautions that actual results may differ materially. In addition, see "Market Update" below and the

"Risk Factors" section contained in the Company's filings with the Securities and Exchange Commission for discussion of the risks associated with such estimated gross sale proceeds.

**Gateway Markets**
- One Multi-Tenant Asset $25 - $30 million
- ***Eight Premier Assets*** (Dallas & UTC are each assumed to be sold in two transactions)
  - ***One Asset $15-$20 million***
  - ***Two Assets $30-$35 million***
  - ***Two Assets $50-$60 million***
  - ***One Asset $60-$70 million***
  - ***One Asset $100 - $150 million***
  - ***One Asset $150 - $200 million***

130.    On this news, the price of the Company's stock fell 27.3%, or $2.54 per share, from a closing price of $9.32 per share on May 10, 2024 to close at $6.78 per share on May 13, 2024, on unusually heavy trading volume.

## DAMAGES TO SERITAGE

131.    As a direct and proximate result of the Individual Defendants' conduct, Seritage has lost and will continue to lose and expend many millions of dollars.

132.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO and interim CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached

their fiduciary duties to the Company.

134.    As a direct and proximate result of the Individual Defendants' conduct, Seritage has also suffered and will continue to suffer a loss of reputation and goodwill, and a "lair's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

135.    Plaintiff brings this action derivatively and for the benefit of Seritage to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as trustees and/or officers of Seritage, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

136.    Seritage is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Plaintiff is, and has been at all relevant times, a shareholder of Seritage. Plaintiff will adequately and fairly represent the interests of Seritage in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

138.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Seritage's Board consisted of Defendants Olshan, McClain, Metz, Nevo-Hacohen,

Sabshon, Thrush, and Wilsmann (the "Trustee-Defendants" or "Trustees"). Plaintiff needs only to allege demand futility as to four of the seven Trustees that were on the Board at the time this action was filed.

140.    Demand is excused as to all of the Trustee-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Trustee-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

141.    Moreover, each of the Trustee-Defendants, that is, Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann, solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Seritage.

142.    In complete abdication of their fiduciary duties, the Trustee-Defendants either knowingly or recklessly caused or permitted Seritage to issue materially false and misleading statements. Specifically, the Trustee-Defendants caused Seritage to issue false and misleading statements which were intended to make Seritage appear more profitable and attractive to investors. Moreover, the Trustee-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Trustee-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

143.    Additional reasons that demand on Defendant Olshan is futile follow. Defendant

Olshan serves as CEO of the Company and has served as a Company trustee since March 2021. As such, the Company provides Defendant Olshan with her principal occupation for which she receives lucrative compensation, including over $2.4 million for Fiscal Year 2023 and $4.4 million for Fiscal Year 2022. Thus, as the Company admits, she is a non-independent trustee. As CEO and a trustee throughout the Relevant Period, Defendant Olshan was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. In addition, Defendant Olshan solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As the Company's highest officer and a trusted Company trustee, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Olshan is a defendant in the Securities Class Action. For these reasons, Defendant Olshan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant McClain is futile follow. Defendant McClain has served as a Company trustee since 2015. He also serves as Chair of the Audit Committee and as Chair of the Compensation Committee. Defendant McClain received and continues to receive compensation for his role as a Trustee, including $175,000 in Fiscal Year 2023 and $92,000 in Fiscal Year 2022. In addition, Defendant McClain solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board.

As a trusted Company trustee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McClain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Metz is futile follow. Defendant Metz has served as a Company trustee since March 2022. He also serves as Chairman of the Board, as a member of the Audit Committee, and as a member of the Compensation Committee. Defendant Metz has received and continues to receive compensation for his role as a trustee including $175,000 in Fiscal Year 2023 and $92,000 in Fiscal Year 2022. In addition, Defendant Metz solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted Company trustee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Metz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Nevo-Hacohen is futile follow. Defendant Nevo-Hacohen has served as a Company trustee since April 2022. She serves as the Chair of the Investment Committee and as a member of the Compensation Committee. Defendant Nevo-Hacohen has received and continues to receive compensation for her role as a trustee,

including $140,000 in Fiscal Year 2023 and $75,000 in Fiscal Year 2022. In addition, Defendant Nevo-Hacohen solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted Company trustee, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Nevo-Hacohen breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Sabshon is futile follow. Defendant Sabshon has served as a Company trustee since April 2022. He serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Sabshon has received and continues to receive compensation for his role as a trustee, including $140,000 in Fiscal Year 2023 and $75,000 in Fiscal Year 2022. In addition, Defendant Sabshon solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted Company trustee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sabshon breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Thrush is futile follow. Defendant

Thrush has served as a Company trustee since 2019, serves as a member of the Audit Committee, and serves as a member of the Nominating and Corporate Governance Committee. Defendant Thrush has received and continues to receive compensation for her role as a trustee including $125,000 in Fiscal Year 2023 and $155,200 in Fiscal Year 2022. In addition, Defendant Thrush solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted Company trustee, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Thrush breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Wilsmann is futile follow. Defendant Wilsmann has served as a Company trustee since April 2022. He is also a member of the Nominating and Corporate Governance Committee. Defendant Wilsmann has received and continues to receive compensation for his role as a trustee including $125,000 in Fiscal Year 2023 and $75,000 in Fiscal Year 2022. In addition, Defendant Wilsmann solicited the 2022 Proxy Statement, the 2023 Proxy Statement, and the 2024 Proxy Statement all of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted Company trustee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wilsmann breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on the Board is futile follow.

151.    Defendants McClain, Metz, and Thrush (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

152.    In violation of the Code of Conduct, the Trustee-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report

known violations of the Code of Conduct and the law. Thus, the Trustee-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

153.    Seritage has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Trustees have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Seritage any part of the damages Seritage suffered and will continue to suffer thereby. Thus, any demand upon the Trustee-Defendants would be futile.

154.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Trustee-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Trustee-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.    The acts complained of herein constitute violations of fiduciary duties owed by Seritage's officers and trustees, and these acts are incapable of ratification.

156.    The Trustee-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Seritage. If there is a directors' and officers' liability insurance policy covering the Trustee-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Trustee-Defendants, known

as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Trustee-Defendants were to sue themselves or certain of the officers of Seritage, there would be no directors' and officers' insurance protection. Accordingly, the Trustee-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Trustee-Defendants is futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Trustee-Defendants will not cause Seritage to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158.    Thus, for all of the reasons set forth above, all of the Trustee-Defendants, and, if not all of them, at least four of the Trustees, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

161.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

162.    Under the direction and watch of the Trustee-Defendants, the 2022 Proxy Statement failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

163.    The 2022 Proxy Statement also failed to disclose that: (1) Seritage lacked effective internal controls which failed to identify and review impairment indicators for real estate investments held by the Company; (2) as a result, Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; (3) therefore, Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

164.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of certain Individual Defendants to the Board, and the approval of the Plan of Sale.

165.    Specifically, the false and misleading elements of the 2022 Proxy Statement led to, among other things, the election of the Defendants Metz and Sabshon, which allowed them to continue to breach their fiduciary duties to Seritage.

166.    Under the direction and watch of the Trustee-Defendants, the 2023 Proxy Statement failed to disclose that, contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

167.    The 2023 Proxy Statement also failed to disclose that: (1) Seritage lacked effective internal controls which failed to identify and review impairment indicators for real estate investments held by the Company; (2) as a result, Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; (3) therefore, Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

168.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the election of certain Individual Defendants to the Board.

169.    Specifically, the false and misleading elements of the 2023 Proxy Statement led to, among other things, the election of the Defendants Olshan, McClain, Metz, Nevo-Hacohen,

Sabshon, Thrush, and Wilsmann to the Board, which allowed them to continue to breach their fiduciary duties to Seritage.

170.    Under the direction and watch of the Trustee-Defendants, the 2024 Proxy Statement failed to disclose that, contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

171.    The 2024 Proxy Statement also failed to disclose that: (1) Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; and (2) as a result, Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

172.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the election of certain Individual Defendants to the Board.

173.    Specifically, the false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of the Defendants Olshan, McClain, Metz, Nevo-Hacohen, Sabshon, Thrush, and Wilsmann to the Board, which allowed them to continue to breach their fiduciary duties to Seritage.

174.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

175.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

176.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

177.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Seritage's business and affairs.

180.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

181.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Seritage.

182.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Seritage's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Seritage

lacked effective internal controls which failed to identify and review impairment indicators for real estate investments held by the Company; (2) as a result, Seritage had grossly overstated the valuation and expected gross proceeds of certain real estate assets held; (3) therefore, the Individual Defendants' boastful statements touting Seritage's business, operations, and prospects were materially misleading. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

183.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

184.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

185.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

186.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate

action to correct the scheme alleged herein and to prevent it from continuing to occur.

187.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

188.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Seritage has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Seritage.

192.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Seritage that was tied to the performance or artificially inflated valuation of Seritage, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

193.    Plaintiff, as a shareholder and representative of Seritage, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

194.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Seritage, for which they are legally responsible.

197.    As a direct and proximate result of the Individual Defendants' abuse of control, Seritage has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Seritage in a manner consistent with the operations of a publicly-held corporation.

147.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Seritage has sustained and will continue to sustain significant damages.

148.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

## SIXTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

153.    Plaintiff, on behalf of Seritage, has no adequate remedy at law.

## SEVENTH CLAIM
**Against Defendants Olshan and Garilli for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    Seritage, Defendant Olshan, and Defendant Garilli are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Olshan's and Garilli's willful and/or reckless violations of their obligations as officers and/or trustees of Seritage.

156.    Defendants Olsan and Garilli, because of their positions of control and authority as officers and/or trustees of Seritage, were able to and did, directly and/or indirectly, exercise

58

control over the business and corporate affairs of Seritage, including the wrongful acts complained of herein and in the Securities Class Action.

157.    Accordingly, Defendants Olsan and Garilli are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

158.    As such, Seritage is entitled to receive all appropriate contribution or indemnification from Defendants Olsan and Garilli.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Seritage, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Seritage;

(c)     Determining and awarding to Seritage the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Seritage and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Seritage and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the

following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Seritage to nominate at least four candidates for election to the Board;

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Seritage restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 15, 2025

                    **THE BROWN LAW FIRM, P.C.**

                    */s/ Timothy Brown*
                    Timothy Brown
                    767 Third Avenue, Suite 2501
                    New York, NY 10017
                    Telephone: (516) 922-5427
                    Facsimile: (516) 344-6204
                    Email: tbrown@thebrownlawfirm.net

                    *Counsel for Plaintiff*